We are now ready to hear argument in the case of Blue Sky Travel. Mr. Curran. May it please the court, Christopher Curran on behalf of the defendant appellants, Al Tayyar Group and Dr. Al Tayyar. I'd like to begin by addressing the statute of frauds issue. Our fundamental position on that issue is that the testimony of the plaintiff, Mr. Riad, establishes that the oral agreement in question falls within the Virginia statute of frauds. As described in his testimony by Mr. Riad, the agreement was formed in June of 2011. Do you think the district judge understood the testimony and misapplied the law or do you think district judge misunderstood the facts? Christopher Curran Well, I think a little of both, but it's perfectly clear that the district judge misunderstood the relevant law and specifically he misread the Silverman v. Bernot case. Why was the contract incapable of being performed within one year? Because as described by Mr. Riad in his testimony, mainly his direct testimony, but also in the cross-examination, it called for both sides to be performing for the entire duration of the period from June of 2011 until the conclusion of 2012, an 18-month period. And critically, and contrary to what the plaintiffs are arguing on this appeal, Blue Sky itself had obligations throughout that period. This is not a situation where one side did not have performance obligations. And specifically, under the agreement as described by Mr. Riad, my client, Altair Group, was required to provide half the tickets during that period to Blue Sky and Blue Sky was required to purchase the tickets. When you say that period, what are you referring to, 18 months? Christopher Curran Well, not exactly. As described by Mr. Riad, the first several months of the period was for Mr. Riad to close down his preexisting travel agency and get a new one up and running. I'm just asking you to define, you keep referring to that period or the period, and I'm just asking you Both sides had obligations throughout the entire 18-month period. With regard to Blue Sky's ticket handling obligations, they began in May of 2012. And under the contract, they were to continue throughout the duration of 2012. And at that time, the parties were to split profits from the resale of those tickets. But why is the district court wrong when the district court says that, I know you make the What if you had decided you were going to buy, you just were going to buy for two weeks or it's foreseeable under the statute of frauds, you could order tickets for two weeks and not order any more? No, I'm asking you, why wouldn't that factual scenario make out? Because as Mr. Riad testified on page 932 of the joint appendix, under the contract, Mr., Dr. Altair told him that Blue Sky would get 50% of the work of Grand Travel. That's throughout that period. So basically, So you think there is the obligation to share at the end of 18 months? Is that what you had your hat on? No, for that period, from May of 2012, when the ticket processing began, until the end of 2012. Well, you know, it seems to me you have to answer yes to one of those to save your case. Maybe I'm wrong. No, no, no. Why couldn't, if something had been done in the first two weeks of May, that would have been within a year from the June 11. That's correct, wouldn't it? That's that's June 11, first two weeks of May. If it's foreseeable or possible, just possible for us to look at that contract, which I think as the district court did and said, you need not have ordered any tickets, but you could have stopped the first week in May, let's say, then that is performable on your side within a year. Why is that not correct? That's not right, because under Silverman, you look at the contract as created and you determine whether that contract called for performance by both sides during the relevant period. No, Silverman says can be fully performed, whether it is able to be fully performed. And in this case, the Saudi ministry could have stopped ordering tickets. No, no. Why not? Because as the contract, as described in the testimony by Mr. Riyad, required Altair to provide half of its tickets to Blue Sky and and there was nothing in that oral agreement that contemplated that the ministry would cancel. Well, what if the ministry only needed excuse me. No, please. What if the ministry only needed 50 tickets? Still doesn't take it out of the statute of frauds. Do we have to accept your version? You're reading, you're interpreting Mr. Riyad's testimony. Now, in a way, excuse me, in a way that benefits your client. But we don't have to interpret it that way. And in fact, we draw all inferences against you. And it seems to me that what Mr. Riyad said is susceptible more than one interpretation. It need not have he need not have literally meant at the end of the year. At the end of that year. Well, for the for the. Do we have to accept your interpretation of the testimony in order? Is that what you're saying? We have to accept. I'm not I'm not trying to interpret the testimony. I'm trying to recite it. And it's clear, I think, that Mr. Riyad in describing the oral agreement said nothing about the ministry canceling tickets or not ordering tickets. That is crucial. But what difference does it make? Because Silverman tells us, I'm sorry, the embassy may have and we're not dealing with. And I think this goes back to Judge Keenan's question. And I may have interrupted your response to her. But I think it goes back to the point that it could have been fulfilled. And Virginia law is a little more is a little more relaxed in that only one side need perform to take it outside the statute. OK, but I think we'll address your question as well as Judge Keenan's. The question is whether it's you can imagine a contingency that allows for performance within a year as the contract is defined, whether full performance can happen under anyone's contemplation in that period. The contract here called for performance over an 18 month period and did not contemplate the cancellation of ticket orders. The contract was dependent upon requests for tickets from the Saudi ministry. That is not in Mr. Riyad's testimony. Are you you're saying that the contract was not dependent on requests for tickets from the Saudi ministry? I'm saying that that was a condition that was not defined as one defining full performance contract. If it certainly is undisputed in this case that the tickets were being requested by the Saudi ministry, correct? That's correct. And so if the Saudi ministry only requested a finite number of tickets, those were the tickets that were at issue here, right? That's true. OK, so the Saudi ministry only requested 10 tickets, then the contract could have been performed in one year by Blue Sky. No, it could not have been. Why not? OK, and for this, I'm relying on the Silberman case. Just answer that question directly. You've been asked about three times. I'd like to know the answer to that. Why couldn't it be have been performed looking forward under that scenario? Because the contract was defined to require full performance through the end of 2012. That contingency you're identifying, the ministry not. Every statute of frauds case involved a contract that has that looks like it goes beyond a year. Otherwise, you wouldn't say anything about statute of fraud. So it seems to me every contract would have some looking obligation beyond. But that's not the test, as we're trying to understand. Because I have this. Can it be done on one side in a year? And if we can see, although it may not happen, if we can see, gosh, there's a way that the embassy could order tickets, order no tickets, order tickets only the first week in May. Why is it wasn't that then? Defeat your argument. Because Virginia law says otherwise. It and just shed the answer to this relying on Virginia law saying otherwise. Silverman. Silver direct me to the language of Silverman on which you're relying. OK, because I think Silverman at page 64 directly refutes what you're saying. Silverman, your honor, the fact look at 654. Yeah. And the paragraph that begins when it appears by the whole tenor. And tell me how that supports your proposition. Right. OK, well, first of all, the whole tenor of the contract here is indisputably one. I'm talking about the paragraph as a whole, not a phrase. OK. When by its terms or by reasonable construction, that's the key, your honor. By its terms or reasonable construction in this case, in the Silverman case, the oral contract said it was for a duration of more than a year or if Mr. Silverman died earlier. That was the crucial fulcrum of the decision there. Right. It was predicated on requests for tickets from the Saudi ministry. No, not that that's not expressed in Mr. Riyadh testimony. I have been entitled to you're saying Blue Sky would have been entitled to many, many service fees if the Saudi ministry had only had only requested 10 tickets. No. What I'm saying is to take this out of the statute of frauds, the oral agreement would have had to say and Blue Sky will be deemed to have full, fully performed if the ministry stops ordering tickets. Because how can it perform and procure tickets when there are no requests for their performance is excused, your honor. But that's not full performance. That's what Silverman says. And that's what fall says. And that's what Warner says. That's what all of these cases under Virginia law say. They say that. Do you think the other contingency as we talk about being possible or probable, you think that has to be expressed in the contract? Yes. And I think Silverman says that. And I think falls says that. Okay. And do you, are you making a distinction between failure of performance or failure to perform within a year and the requirement to perform outside a year if you called on to perform? Is that the decision you're making? If I can say, in my mind, the distinction is whether the contract contemplates full performance or allows for full performance in less than a year or alternatively, whether there's some condition that could arise that's not contemplated in the agreement that could excuse performance. Well, we would be, in your theory, we would be in the second category to even debate it. That's right. Because you don't see any expressed alternative or contingency in the contract. Exactly. Exactly. Go ahead. Although Silverman says that if it can be done by the occurrence of some improbable event, the contract nevertheless is not within the statute. Yeah, but that's in the same sentence. It says by its terms or reasonable construction. So the question here then is by the terms or reasonable construction of the, of the oral agreement as testified to by Mr. Riad, did the party say that Blue Sky shall have fully performed if the ministry stops buying tickets? And, and your honor, this case is more like Lee's, the Lee's administrator case, which is distinguished here on the, on the next, on the next page of my printout anyway. You'll see there's a paragraph talking about in contrast in Lee's administrator versus Hill. That's on page, it looks like 657, 656. I'm still trying to understand the distinct, well, I have, let me start with, does your argument depend on our accepting your characterization that the contract was of, was of a certain duration, that it was 18 months? Yes. Yes, it does. And that, and as I, as I pointed out, that's the unequivocal testimony of Mr. Riad on pages 826 and, and, and then after that on page 932, where he says, I have looked at that testimony and I, I don't think it's as unequivocal as you seem to think it is. Okay. Is there anything else? Well, no, no, we're, we're, we're depending on the testimony of Mr. Riad and his description of the contract and the fact that it requires performance on both sides during the period and does not contemplate, does not expressly address the contingency of the ministry stop ordering tickets. That takes the case out of Silverman. Are you planning on, I'm sorry, I didn't mean to interrupt, are you going to be addressing the spoilation argument? I would like to, yes. Well, let me say this, I'll either, you could either address it quickly for, and to put it on the table, or if you want to go more than say 30 seconds to at least put it on the table, we will let you use your time subject to questions from the court. We'll go as long as we have questions. So why don't you start on it? We'll see what happens to your time. Okay. Thank you very much, Judge Ed. On the spoliation, the magistrate judge was legally wrong to conclude that there was spoliation here. Spoliation applies only when a party has noticed that a, that the documents in question are relevant, and then takes some intentional step to prevent them from being produced. That did not happen here. There's no evidence that, that my client ATG was on notice of the relevance of these documents. Were you ordered to produce the documents, was it July of 2013? Or August. And in fact, and you ultimately said, um, in September or later, I believe, that you couldn't produce them because they were destroyed. They had been destroyed. Is that correct? That's correct. But you also didn't begin looking for these documents until after the court's August 30th order, which was after the extended deadline of August 21st, which was after you had at least implicitly, implicitly acknowledged having invoices because you sent what you refer to as a sampling. Well, is any of that incorrect? Factually incorrect? No, it's not factually incorrect. But I think it can be explained and justified. Trial counsel misunderstood what was being asked for by the court's order. But that's not that, um, that defeats your notice argument. The fact that it was misunderstood doesn't mean you didn't have notice, which the court clarified. But there's nothing, I'm sorry, but there's nothing in the record, Your Honor, indicating when the documents were destroyed. Okay. The trial counsel thought that when. There's an indication in the record that you had documents when you sent what you refer to as a sampling. Oh, I don't think that's true, Your Honor. Well, then how could you send the sampling of invoices? Those, the sampling of invoices was the invoices related to Blue Sky, Blue Sky's own purchases and the resale of those. The sanctions are based on the invoices for other vendors. Those documents were never sought during discovery until at the tail end, a request was made in a deposition. And it's true that trial counsel didn't know that those invoices had long ago or had been destroyed. And he instead provided the data reflected from those invoices. So you're saying that you did not indicate to the court that you had produced a sampling of ATG's, ATG invoices sent to the ministry? Well, those invoices being referred to there are the Blue Sky invoices. Those are not the invoices that underlie the finding of spoliation. But wasn't the point that Blue Sky was entitled to see all of the invoices to determine the, well, for one thing, to determine the profit, the margin profit? Blue Sky's theory of the case, Blue Sky's theory of the case was that they were entitled to split the profits on the resale of the Blue Sky purchases only. And therefore, the only information that Blue Sky sought during discovery was related to those invoices. It was only at the tail end of discovery in a deposition where there was a request made for the invoices related to other vendors. Did you provide an omnibus bill including tickets from all the agents with whom you grouped Blue Sky? Yes. Yes. All of them? Yes. And there's nothing in the record to dispute that. Well, there actually, Blue Sky sought sanctions because you failed to produce all of those invoices. I don't think that's right. I think that... And you said that you had produced a sampling, but there was no way to verify that without looking at all the invoices or to determine the amount of profit sharing, the amount of profit that was to be split. No, I don't think that's right. There was a hearing at which trial counsel said that the Blue Sky invoices that had been produced was a sampling. He came back at the very next hearing and said, no, I've confirmed that all Blue Sky invoices had been performed. And the spoliation decision and the sanctions are based entirely on invoices related to vendors other than Blue Sky. Yes. Absolutely. Thank you. Thank you very much. We will let you have some rebuttal time. Thank you very much. Thank you. Mr. Young. Thank you. Good morning. Warner Young on behalf of Blue Sky, the plaintiff in the case, the appellee here. I think the court correctly focused on the issues with respect to the statute of frauds, and that's that one party could have completely performed this contract within a year. But let me ask this first. Do you deny that the agreement was for splitting profits through 12? No, I do not. It was you had an agreement that went from June of 11 through end of it's not completely, I guess, but it was through December of 12. It was to go through December of 12, at which time. Right. So it was roughly 18 months. Correct. Okay. At that time, profits were to be paid by ATG to Blue Sky. Right. As the court correctly concluded in its memorandum opinion, that was an obligation which belonged solely to ATG. And you want your damages would be during that 18-month period? Correct. Yes, sir. Our damages were related to the tickets that we sold. Our part of the bargain, our part of the performance under the contract was to buy all the tickets that we got GRs for. GRs were government orders or government requests for tickets for their students. When the law talks about, I interrupted your facts, but I think. That's all right. We kind of know the facts, but I'm sure we'll get into some more. When the law talks about foresee something, no matter how improbable, do you think that's limited to express provisions of the contract? In other words, you have a contract for 18 months or unless we go out of business, then the chances that the other side would go out of business are basically nil. But that would at least be an express provision, although impossible, which could happen. So my question now back to you is, do you think that no matter how improbable, that looking forward to something, no matter how improbable, is that limited to something clear in the contract as an alternative basis to end the contract? Or is it anything anybody can fathom? I believe it's anything that anybody can fathom. Well, it's really not anything anybody can fathom, isn't it? Because you have to draw a distinction between performance and non-performance. Correct. It has to be performance. Yes, that's correct. And not non-performance. You agree? I do agree. So the question in this case takes it back to the facts, which is, could Blue Sky have done what it said it was going to do, which was buy tickets within the period of a year? And His Honor found that that's exactly what they could do. And he found that, addressing one of the first questions that you addressed to other counsel, as a matter of fact, not as a matter of law. He found that Blue Sky could have performed this contract within a year. And I would direct the Court's attention to his memorandum opinion, footnote four, where he says, he made two specific factual findings. Even were there profits to share, such that ATG could not perform its obligations, not perform until the end of 2011, Blue Sky might have still performed all of its duties within a year in order to receive its share of those profits. So that is a factual determination that he made. And I believe— That's the application of the contract for purposes of statute of fraud. That seems to me at least a mixed question, I would think. Well, Your Honor, certainly the application of the law to the facts is always a mixed question. And I don't want to belabor that point with you, but whatever he did look at it and say, as a matter of law and fact, statute of fraud doesn't apply. That is correct. But my point, I suppose, in that was to point out that the obligation to pay profits belonged to ATG. It did not involve any continuing performance by Blue Sky beyond the period of time it was to buy tickets. This is just like the Warner versus Texas Railroad or Texas and Pacific Railroad case. Can I ask you this? If in fact—I'm just asking the guy— Yes, sir. —if it's the right area. Isn't there ancillary to the splitting profits, isn't there some kind of accounting or record using of something to figure out what the profits were for the 18 months? On ATG's part, yes. Not on the part of Blue Sky. All Blue Sky did was buy the tickets at whatever the cost at a $100 fee for the covering the overhead at that point, or at least a part of the overhead, and send its invoice to Blue Sky. Mr. Riad's testimony was unequivocal that at the end of the year— But you think it's triggered—I've been asking my hypotheticals in the case that the other side stopped ordering tickets, but you don't look at it that way. Oh, I do. But do they have—don't they have an obligation then to do an accounting at the end of the contract? ATG has an obligation to account. So do you think their obligation could be performed within a year? It could have. It could have been done after the issuance of one ticket. Well, how could that be? You don't know if they're going to order anymore. Even if they stopped after one month, they would have no obligation to pay you until the end of 18 months, do they? No obligation, that is correct. I'm just asking. So you think their side of the contract could be performed within a year? I think it could, because I think it had—again, no matter how improbable, had we gotten an order for one ticket or 10 or 100 on the very first day, and after that first batch, ATG simply said, we don't like the way you did it, that we're not sending you anymore. You were only guaranteed the tickets that we send to you. So although— We can compute the profit on what we did on those tickets, and we can send it to you today. Although they had an obligation, they had an obligation to pay you at the end of 18 months, and could have waited on that. Could have. You say that the law is, since they could have paid you earlier—I'm not talking about ordering tickets, I'm talking about paying you earlier—they could have performed within a year. Well, Your Honor, I do think they could have performed. However, that's really not the crux of the argument. No, no, no. But I just want to get it clear, because that's what I was—I was trying to understand the argument. Because I think you made it on the other side. You made it on your obligation. Correct. I'm just—I'm just saying. So you don't really argue that their obligation could be performed in a year? No, Your Honor. I was trying to— The argument is your side. Your side is, we ordered tickets that we were asked to order, and if we only asked first month, then we're done. That's correct. And that satisfies the statute of frauds, because one party has fully performed within the year period. Under Virginia law. Yes. Which is a little unusual. Yes. It is. It is not necessarily the norm. I had—oh, I'm sorry. No, please. No, please. If you had—I wanted to go to the discovery sanctions issue and the timeline. As I understood it, the point of asking for the invoices was to determine how much of a profit ATG made on the tickets it resold to the ministry. Correct. Is that correct? So you asked them to produce any document that they were relying on to support their argument that they didn't mark up or inflate the ticket prices. Correct. Is that correct? And there was some disconnect there, and so a hearing was held on July 12th, and the that they should only have to provide a sampling of the invoices, because the sample might not be representative and might and would not necessarily answer the question across the board about the markup. That is correct. That's correct. So an appellant said, well, it would be hard for them to produce all the invoices, because the invoices group tickets from 10 or 11 agents. And the district court said, that's your problem. That's how you do it. Figure it out and comply with the discovery order. Correct. So on August 2nd, you had another hearing because appellants had produced a sampling. Correct. Again. And they agreed to stipulate to the 5%, and the court said, no, they have to have all the tickets to see what the markup is, because they can't do it on the basis of a sampling. And because you argued that they made a 5% commission on all the tickets, they had to produce all the invoices. And so they were ordered to produce all the invoices by August 16th. Correct. And then on August 5th, they asked for a two-week extension. The court held a hearing and extended the deadline to August 21st. On August 21st, they sent spreadsheets. They still didn't send the invoices. Then on, it was on September 13th that they said they weren't able to locate any invoices because they'd all been destroyed. That is correct. So the contention is that they didn't know that they were supposed to keep invoices other than those involving Blue Sky. They just weren't on notice. So factually, how do those two, how do the facts in the argument line up? Several ways. First of all, I would point out that one of the things that I did during trial was read into evidence a portion of Dr. Nasser Al-Tayyar's deposition, wherein he acknowledged that they had all of the invoices in July of 2013, at the time that I took his deposition. And I read that into evidence during the course of the trial. Secondly, they testified or provided a response early on that all of the invoices were omnibus, meaning there was no segregation. They were aggregate. Aggregate. There was no segregation by vendor. So if they had all aggregate invoices and we requested invoices, that should have put them on notice, of course, that they had to keep all of those documents because they all might have very probable or all will have. All might have been? I apologize. All will have information that we needed in order to establish what was billed to the Ministry for our tickets. But didn't the magistrate judge employ the wrong legal standard when he said that when this litigation started, the defendants were required by law to preserve? Any document retention policy you had stopped had to be stopped. That was the law. Well, that's not the law. I agree. That is not the law. And that was the wrong legal standard. Well. However. And then the magistrate judge didn't even bother addressing the honey reggae affidavit that said that the and made no credibility finding. And you have this affidavit in the record that the document was destroyed in the regular course of business and that the judge had used the incorrect standard of law to make the finding of spoliation. So it seems to me this whole finding of the court is resting on a very shaky and weak foundation. How do you keep it? How do you keep it upright? Well, a few ways. Yes, that's the wrong standard to apply if he was ruling purely as a question of spoliation. As I stated in the brief, this was not a case of where he decided the issue purely on spoliation. This is a spoliation remedy, though, that the court employed. It was not a discovery remedy. Classically. Do you agree with that? Don't you? No, I do not. You agree that in a classic discovery dispute, when the materials are available, but simply not timely produced, that a court ordinarily would fashion a jury instruction of a presumption that the one side had proved its case as alleged. You're saying that's a that's a traditional discovery remedy employed by a court as opposed to spoliation. After five hearings, at which time. No, no. Could you answer me? I'm talking. Yes, I was trying to. How is that a classic discovery? Because. I've never heard of anything being. This was not a sanction on one motion. This was not my motion. But she asked you, was that a classic remedy? Why is this not a classic spoliation remedy as opposed to a discovery remedy? Based on an incorrect perception on the part of the judge applying the wrong standard of law. And I'm sorry if I'm not addressing your question.  There were five motions for these documents to be produced. No, I understand what happened factually. And so I am saying the number of times they were not produced over time. But not only not. Wait, wait, wait, wait, wait. I'm sorry. You have to let her finish. I apologize. We'll try to let you answer, but you have to let her finish. I apologize. OK, never mind. Go ahead. No, I was. No, that's fine. I don't want to take any more time. Go ahead. OK. Do you think that one of the things the court was concerned about is that it wasn't just. The remedy looks like a spoliation remedy. But the it wasn't that the discovery was produced late. It was just that it was never produced. And there some assumption had to be made about the what the margin of profit was correct. There was no other way to determine the margin without having the documents. And the documents have been ordered to be produced on multiple occasions. And it was never, ever alleged that they had been destroyed early in the process. Well, otherwise, what would we and I'll ask the other side this. Also, is there anything in the record? Other than ATG's representation about the commission without these documents? No, that was the only well, ATG's profit. Yes, the markup. Well, I'm sorry, I meant. The court concluded that because ATG makes a 5% commission on all tickets. And you argued that that was not correct. And ATG said made a proffer will accept 5% is the number. That was the number that they gave. Correct. Was there any way to. Rebut that number without the tickets. I needed to have the tickets and Judge Magistrate Davis clearly understood that. There were alternative ways of looking at some public documents that we could calculate what that amount was in a circumstantial way. But the only direct proof would have actually been the invoices. And that's what he had ordered to be produced. Getting back to Judge Keenan or Justice Keenan's question. Yes, it's the wrong legal standard. However, I would point out two things. That's not the standard that Judge Tringa relied upon on the rule 72 hearing. And Judge Tringa did again in his order based on. Are you referring to the September order or the October order? I can give you the September 20th and one was October 21st, I believe. It would have been the September order on the rule 72 motion because the trial was in September. And that was before the trial. And his order on that motion made it clear that the decision was based on repeated discovery abuses throughout the magistrate's hearings. Nowhere in his order does he mention spoilation or destruction of documents or that he's sitting as the reviewer had relied on any spoilation at all. So he applied the correct standard. He had wide latitude to do so. And he affirmed the sanction that was there. Moreover, I would point out that the appellant, Blue Sky, excuse me, Altair Group, did not preserve that argument at the time because it never suggested to Judge Tringa in papers or in arguments that the magistrate had applied the wrong standard. That issue is being raised for the first time here on appeal. So Judge Tringa was presented an issue on rule 72 motion. He ruled on that motion that it was a discovery abuse sanction and he awarded it. I'd further point out. Is your argument then, would your argument be if we were just looking at the magistrate's opinion, you would say that is an error of law, which is an abuse of discretion. Correct? I would say that's correct. But you say that the district judge didn't apply that law. So it's not an error of law and not per se an abuse of discretion. And so we just look at it under a sanction for discovery problem. And that's judged by abuse of discretion for discovery sanction. Yes, sir. Okay. Right. The Judge Tringa said after repeated failures on the part of ATG to comply with its discovery obligations. Well, there's no question it didn't comply, but they were addressing the destruction of the documents, were they not? So aren't you elevating form over substance? What we're talking about here is the penalty imposed for the destruction of the documents so that they could not be obtained for purposes of inspection and use at trial. No, I don't believe so. And I think the next part of that sentence in his order was not only the repeated discovery abuses, but that, as I recall, the next sentence and their failure to adequately explain the reasons. There was no rational explanation for why this happened and why it didn't happen from the get-go. The reason that I'm at a bit of a loss is what other sanction would have remedied the harm here? Even if it's spoliation, what other sanction puts a pelee in the position that they should have been had these documents been available? Because the court went on to say that the discovery failures effectively eliminated, if not entirely eliminated, a pelee's opportunity to establish damages. Agreed. So does it, what's the, so I'm wondering about the spoliation analysis if the sanction remedy could have come to the same result. And I would imagine you would agree with me and I should address that question to appellate. I would agree. I see that my time is up. We have another question. Are there any facts in the record that would indicate that ATG had reason to know that the documents were relevant at the time they were destroyed? Well, since the record does not indicate when the documents were destroyed at all, that was not part of anything that ATG ever offered, including in Mr. Really, at this point, do we? Well, I can only go by what the, what Dr. Nasser Al-Tayyar testified to, which was we still have those documents in July. Right, but the magistrate judge, when he was making his finding and reciting his erroneous legal proposition, he didn't recite to any facts that would support a finding that ATG knew or had reason to know at the time the documents were destroyed. That the invoices were relevant or could lead to relevant material. And see, that's to me the crux of the problem here. Well, respectfully. There's no factual underpinning. Even if you can wash away the erroneous legal standards, we don't have any factual underpinning in this record. The factual underpinning that I see is representing to the court on one day that you've done a sampling and then coming back and saying it's not a sampling. It's then ultimately producing 5,288 pages of documents and calling them the invoices in pleadings and an oral argument. And only after Judge Davis pointedly questioned counsel did they finally admit that those were not, in fact, invoices as they had just represented to the court, but were spreadsheets that their counsel at trial acknowledged were not created until August 19th of that year. Why wouldn't the factual underpinning derive from the July 12th hearing when Judge Davis rejected appellant's argument that they should only have to provide a sample of the invoices because that sample may not be representative? It does. And the fact that it was a sample implies that they had all of the invoices. Well, and they acknowledged that they did because they essentially said, well, it's difficult because we sent them in aggregates, but they never said they didn't have them. Correct. They, in fact, said it would be too much of a burden for us to produce all those at this time. Thank you very much. Thank you very much. Mr. Curran, you have some more time if you want to come back up here. I do, Your Honor. Thank you. There should have been a hearing to determine the facts. There was an affidavit submitted, the Raggi affidavit at page 576 of the joint appendix, and it established without any rebuttal. Right, but nobody addressed it. The magistrate judge didn't address the affidavit. Nobody made a credibility finding on it. Right. There should have been a hearing and findings and an establishment of the facts before. Did the Defendant's counsel ever ask the court to make a credibility finding as to that affidavit? Well, Your Honor, we submitted the affidavit, and in the brief that accompanied the affidavit, we invited the court to examine Mr. Raggi further if it had any questions. The magistrate judge declined to take that invitation. Did you object before the magistrate judge regarding the application of the legal standard as articulated by the judge? Absolutely. Absolutely. I mean, the idea that a corporation is required to preserve every document just because litigation starts is fanciful, and that point was made repeatedly. No, no. But, well, we probably didn't need to, but we did. Okay. The point is this. Let me say under the rules. You say you should have had a hearing. A hearing can be on papers. He wouldn't have to bring you in and take other testimony. I suspect you would argue, wouldn't, it seems to me the argument is you would at least want him to explain it and address it. Well, and consider. Because you don't think, and I don't want to blame him. He doesn't have any obligation, or she doesn't have any obligation to have a hearing in the courtroom. I guess that's right. Obligation, I said. But, no, that's correct. But if the magistrate judge is going to decline to accept an affidavit that stands unrebutted. I don't want to belabor this, but they could do that on the record and explain why they didn't take it. It wasn't signed. This one was. I'm not saying, I'm just talking about it as an example. Yes, yes. The interesting question I have is, well, it wasn't my question, it was Judge Duncan's question. What about another sanction that would remedy what the judge thought your client had done? And, you know, a sanction that would have been proportional would have been something that addressed the actual harm to the plaintiff's case. Which would have been what? Which would have been to say that the defendants can't make an argument that it paid only 5% with respect to other vendors. And let me elaborate upon that, if I may, Judge Shedd. Recall, I just heard plaintiff's counsel repeat what he said in the district court, and that was that his ability to prove damages was hamstrung and impossible, essentially, because of these documents not being available. Okay, first of all, the plaintiff never sought these documents in their discovery requests, right? They made discovery requests, including document requests, but they sought only the invoices and information about invoices that knew Skyhand. No, you were asked to produce any document you were relying on to support your argument that you didn't mark up and inflate ticket prices, and you responded, no documents exist. Right. And so that began the, from no documents exist to there are documents, but they were all destroyed, is a troubling sequence of events. May I address that? Of course. And I'm sorry, I also interrupted Judge Shedd. I think it's the same frame. We are, we'll let you answer. No, I think we all are. That document request that you're referring to, and you read it correctly, says documents that Altair is relying upon with respect to the profits. Altair had no intention to rely upon those documents. Altair had witnesses who were prepared to say, we charge 5% across the board. And no one was to be allowed to question that? They were to, you expected opposing counsel to rely on your representation? They could question it, or they could make a proper document request that called for. And on the basis of what? They were asking for the documents that would allow them to do that on an informed basis. Judge Duncan, they could have done that, but they didn't. That document request is expressly termed in, with respect to documents that defendants were relying upon. There was nothing inhibiting the plaintiffs from asking for any documents relevant to invoices for other vendors. They declined to seek those documents. But didn't it become clearer as the hearings progressed and the magistrate judge's irritation grew? Well, eventually it became clear that notwithstanding the absence of a document request, the magistrate judge, of course, ordered the invoices to be produced. The invoices never were. There's no question about that. But the spreadsheets show the same data. And the record is unrebutted that those were ordinary course spreadsheets that provided all the data from the invoices. So what's the prejudice? You're saying without a credibility finding against Mr. Regi, or however you pronounce it, that there was no failure to produce the information, although they weren't producing the actual invoices? That's right. I'm saying that since the information was provided and there was unrebutted statement that that was the actual data. And furthermore, Mr. Regi's affidavit also said that the invoices were destroyed or discarded at the time that they were paid by the ministry. That stands unrebutted as well. I thought the magistrate judge rejected the idea that the invoices were an adequate substitute. The magistrate judge did reject without explanation or justification. He never explained why the spreadsheets, which is the normal way corporations keep information, why those weren't an adequate substitute for the actual invoices. Let me ask this. What do you think the appropriate, take your proper 5% off the table, what do you think would have been the appropriate sanction? Well, that would have been proportional to the situation. What do you think would have been the proper sanction? The proper sanction. Proper sanction would have been to bar the defendants from making any argument that they paid 5% on the other vendors as well. They could still make the argument that they paid only 5% on the Blue Sky invoices, but they got to rely on that evidence. And that's why the plaintiff's claims of prejudice just don't add up. There was nothing stopping the plaintiffs from making a damages argument based on the Blue Sky invoices and the resale of those to the ministry. Nothing, and that's why they only sold those documents. Did you ever, then I'm confused about what the district court ordered. You said that it would be difficult for you to produce all the invoices you sent to the ministry for tickets issued by Blue Sky because their invoices group tickets from 10 to 11 agents. Yeah. And you never after that came back with anything other than, I mean, you never came back with all those invoices. Mr. McMahon clarified at the very next hearing, the trial counsel for ATG clarified at the next hearing, he was mistaken. Those were the only two invoices that were previously provided. In my final second, I'd just like to say on the statute of frauds, our case rests upon the Silverman case and a fair reading of the Silverman case and its description of Corbin on contracts and Williston. They all make clear that the condition to take a case out of the statute of frauds has to be expressed in the oral agreement. Let me ask one question about that, but I want to ask this. Did you understand the district court to base its argument that the contract could be performed within one year on the other side's obligation or on your obligation? I understand. And did you agree with it? I'm asking what it's based on as you take it. I think it's clear that the district court concluded that if the ministry stopped buying tickets or ordering tickets through ATG, then Blue Sky. Blue Sky seems not to be arguing that. They seem to be arguing, do you understand? I'm just asking. I'm trying to clarify this. Them to be arguing that they did all that was asked of them. Your Honor, as I've stated, my interpretation of the district judge ruling, that's what we addressed in our opening brief. The other side did not rebut that. They know that my interpretation of Silverman is correct, that that is an untenable position. The idea that a condition not expressed in the oral agreement can take a case out of the statute of frauds, that's fanciful. No case would ever fit in the statute of frauds. If any condition that could be imagined that would stop performance. Not any condition that could be imagined. Any condition regarding performance. Right, like impossibility? Regarding performance as opposed to non-performance. So the death of a party would not be an excuse because it's non-performance as opposed to any condition regarding performance. But the possibility of death, Your Honor, was the reason why Mrs. Bernot in the Silverman case was able to proceed on her case. Because there, the oral contract referred to the death of Mr. Silverman. Thank you for your patience. Thank you very much. We'll step down to great counsel and go directly to the next case.
judges: Dennis W. Shedd, Allyson K. Duncan, Barbara Milano Keenan